774 N.W.2d 416 (2009)
17 Neb. App. 867
In re INTEREST OF LOUIS S. et al., children under 18 years of age.
State of Nebraska, Appellee and Cross-Appellee,
v.
Chad S., Sr., Appellant and Cross-Appellee, and
Carmela F., Appellee and Cross-Appellant.
No. A-09-105.
Court of Appeals of Nebraska.
September 1, 2009.
*420 Rex J. Moats, of Moats Law Firm, P.C., L.L.O., and Douglas D. Dexter, for appellant.
Donald W. Kleine, Douglas County Attorney, Jennifer Chrystal-Clark, and Sean Lavery, Senior Certified Law Student, for appellee State of Nebraska.
Anthony W. Liakos, of Govier & Milone, L.L.P., for appellee Carmela F.
SIEVERS, IRWIN, and CASSEL, Judges.
SIEVERS, Judge.
Chad S., Sr. (Chad), appeals, and Carmela F. cross-appeals, from the decision of the separate juvenile court of Douglas County terminating their parental rights to their minor children in a case in which the Nebraska Indian Child Welfare Act (ICWA) is applicable. We affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND
This case is governed by the Nebraska ICWA, Neb.Rev.Stat. §§ 43-1501 through 43-1516 (Reissue 2008), and involves seven children: Alicia E., born in October 1995; Louis S., born in September 1999; Chad S., Jr. (Chad Jr.), born in October 2001; Unique S., born in October 2002; Heaven S., born in September 2003; Henry S., born in January 2005; and Charlotte S., born in June 2006. Carmela is the biological mother of all seven children. Chad is the biological father of Louis, Chad Jr., Unique, Heaven, Henry, and Charlotte. The biological father of Alicia is not a party to this appeal, and thus his participation in this case will not be discussed further.
The six older childrenCharlotte was not born yetwere removed from the home of Chad and Carmela on October 18, 2005, due to the living conditions in the home. At the time of removal, there was no running water in the home; the toilet was not working and was full of feces and urine; the children were dirty and wearing filthy, soiled clothing; and all of the children had severe head lice. A methamphetamine pipe was also found in the home. The children were placed in emergency protective custody. The State initially filed a petition with the juvenile court on October 20, alleging that the children were within the meaning of Neb.Rev. Stat. § 43-247(3)(a) (Reissue 2004). A motion for temporary custody was filed and *421 granted that same day. The children have been in the custody of Nebraska's Department of Health and Human Services (DHHS) since that time.
The State filed an ICWA notice with the juvenile court on October 24, 2005, and such notice was also sent to the Omaha Tribe of Nebraska. The notice was for the purpose of determining whether the children were members of, or eligible for membership in, the Omaha Tribe, thereby making the ICWA applicable.
By an order filed by the juvenile court on February 23, 2006, the six older children were adjudicated to be within the meaning of § 43-247(3)(a) insofar as Chad and Carmela were concerned. Sometime between the children's initial removal from the home and September 19, 2006, Chad was arrested and incarcerated in a federal penal institution located in Colorado. We also note that the children were returned to Carmela's care for approximately 6 months from November 2006 to May 2007. In May 2007, the children, including Charlotte, were returned to foster care because Carmela had been evicted from her home and had an admitted drug relapsethe evidence shows that Carmela has a methamphetamine addiction. Numerous amended petitions, disposition orders, and a motion to terminate parental rights were filed between the time of removal on October 18, 2005, and a hearing on June 30, 2008. However, we will not discuss these pleadings and orders, because such are not necessary for resolution of this appeal.
On June 25, 2008, Carmela filed a motion to transfer the case to tribal court. A hearing was held on June 30. Chad did not object to the transfer. The State objected to the transfer, alleging that it did not get proper notice, and the guardian ad litem joined the State's objection. For the first time, evidence was presented that all seven children were members of, or eligible to be members of, the Omaha Tribe. The juvenile court found that the ICWA was applicable to the proceedings, but orally denied the transfer, stating that "there is good cause not to transfer this case because it's been a great many years that it is before this Court, and it would not be in the best interests of these children to transfer the matter." The State moved to dismiss certain supplemental petitions and its motion to terminate parental rights, because such pleadings did not conform to ICWA requirements. The juvenile court dismissed such without prejudice.
On June 30, 2008, the State filed a fourth supplemental petition, alleging that the youngest child, Charlotte, was a child within the meaning of § 43-247(3)(a) (Cum. Supp. 2006) as far as Chad was concerned, in that Chad was incarcerated and unable to care for Charlotte or provide Charlotte with stable and adequate housing. The petition also alleged that Chad's parental rights to Charlotte should be terminated pursuant to Neb.Rev.Stat. § 43-292(1) and (2) (Reissue 2008). The State specifically alleged that active efforts, pursuant to § 43-1505(4) of the ICWA, had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the family, but that said efforts had proved unsuccessful. The State also alleged that continuing the custody of Charlotte by Chad would likely result in serious emotional or physical damage to the child and that it was in Charlotte's best interests that Chad's parental rights be terminated.
A fifth supplemental petition regarding Alicia was also filed, but we will not discuss such, because it is not necessary to this opinion.
The State also filed a second motion for termination of parental rights, alleging *422 that all seven children were enrolled, or eligible to be enrolled, in the Omaha Tribe. The State filed a motion to terminate Carmela's parental rights to all seven children under § 43-292(2) and (6). The State also sought to terminate her parental rights to Alicia, Louis, Chad Jr., Unique, Heaven, and Henry under § 43-292(7). The State filed a motion to terminate Chad's parental rights to Louis, Chad Jr., Unique, Heaven, and Henry under § 43-292(2), (6), and (7). (Charlotte was not named in this motion insofar as Chad was concerned, but she had previously been named in the fourth supplemental petition seeking termination of Chad's rights as to her.) The State also specifically alleged with regard to Chad and Carmela that active efforts, pursuant to § 43-1505(4) of the ICWA, had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the family, but that said efforts had proved unsuccessful. The State also alleged that continuing the custody of the children by Carmela and Chad would likely result in serious emotional or physical damage to the children and that it was in the children's best interests that Carmela's and Chad's parental rights be terminated.
The termination hearing was held on October 8 and 16 and November 5 and 6, 2008. Several witnesses testified, and such testimony will be discussed as necessary in our analysis.
The juvenile court filed its order on January 9, 2009. The juvenile court found that grounds for termination of Carmela's rights to Alicia, Louis, Chad Jr., Unique, Heaven, Henry, and Charlotte existed under § 43-292(2) and (6). The juvenile court also found that grounds existed to terminate Carmela's rights to all of the children except Charlotte under § 43-292(7). The juvenile court found that grounds for termination of Chad's rights to Louis, Chad Jr., Unique, Heaven, and Henry existed under § 43-292(2), (6), and (7). The juvenile court found that grounds existed to terminate Chad's rights to Charlotte under § 43-292(1) and (2). The juvenile court found that active efforts, pursuant to § 43-1505(4) of the ICWA, had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the family, but that said efforts had proved unsuccessful. The juvenile court also found that continuing the custody of the children by Carmela and Chad would likely result in serious emotional or physical damage to the children and that it was in the children's best interests that Carmela's and Chad's parental rights be terminated. The juvenile court terminated Chad's and Carmela's parental rights to the children after finding that grounds for termination existed and that such was in the children's best interests. Chad has timely appealed, and Carmela cross-appeals.

II. ASSIGNMENTS OF ERROR
Chad alleges that the juvenile court erred in (1) finding that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the family, (2) admitting the opinion of an ICWA expert that continued custody of the children by Chad would likely result in serious emotional or physical damage to the children, and (3) terminating Chad's parental rights when there was insufficient evidence to prove that the continued custody of the children by Chad would likely result in serious emotional or physical damage to the children.
On cross-appeal, Carmela alleges that the juvenile court erred in (1) overruling her motion to transfer the proceeding to the jurisdiction of the Omaha Tribe of Nebraska; (2) finding that active efforts *423 had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the family, but that said efforts proved unsuccessful; (3) finding that the minor children came within the meaning of § 43-292(2) with respect to Carmela; (4) finding that the minor children came within the meaning of § 43-292(6) with respect to Carmela; (5) finding that termination of Carmela's parental rights was in the best interests of the minor children; (6) finding that continued custody of the children by Carmela would likely result in serious emotional or physical damage to the children; (7) finding that it is in the best interests and welfare of the minor children to remain in the custody of DHHS for adoptive planning and placement; and (8) terminating Carmela's parental rights.

III. STANDARD OF REVIEW
Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of the juvenile court's findings. In re Interest of Tyler F., 276 Neb. 527, 755 N.W.2d 360 (2008). However, when the evidence is in conflict, the appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. Id. In reviewing questions of law, an appellate court reaches conclusions independent of the lower court's ruling. Id.

IV. ANALYSIS

1. TRANSFER OF PROCEEDINGS
Carmela argues that the juvenile court erred in overruling her motion to transfer the proceedings to the jurisdiction of the Omaha Tribe of Nebraska. Section 43-1504 states in part:
(2) In any state court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe, except that such transfer shall be subject to declination by the tribal court of such tribe.
(Emphasis supplied.)
A denial of a transfer to tribal court is reviewed for an abuse of discretion. In re Interest of Lawrence H., 16 Neb.App. 246, 743 N.W.2d 91 (2007).
On June 25, 2008, Carmela filed a motion to transfer the case to tribal court. A hearing was held on June 30. Chad did not object to the transfer. The State objected to the transfer, alleging that it did not get proper notice, and the guardian ad litem joined the State's objection. The district court found that the ICWA was applicable to the proceedings, but orally denied the transfer, stating that "there is good cause not to transfer this case because it's been a great many years that it is before this Court, and it would not be in the best interests of these children to transfer the matter." The court also noted that the tribe had not intervened in the matter. No written order reflects the juvenile court's denial of the transfer.
By the time of the June 30, 2008, hearing, when proof of the children's membership or eligibility for membership in the Omaha Tribe was offered to the juvenile court, this case had been before the juvenile court for more than 2½ years. The Omaha Tribe had not intervened. These are valid and logical reasons for the trial court to maintain jurisdiction. Therefore, we cannot say that the juvenile court *424 abused its discretion in declining to transfer jurisdiction of these proceedings to tribal court. Accordingly, the assignment of error lacks merit.

2. TERMINATION OF PARENTAL RIGHTS
Carmela argues that the juvenile court erred in finding that grounds for termination of parental rights existed under § 43-292(2) and (6). "We have held that the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. `Thus, only one ground for termination need be proved in order [to terminate] parental rights ....'" In re Interest of Ty M. & Devon M., 265 Neb. 150, 173, 655 N.W.2d 672, 691 (2003) (quoting In re Interest of Michael B. et al., 258 Neb. 545, 604 N.W.2d 405 (2000)). The ICWA, however, adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. In re Interest of Walter W., 274 Neb. 859, 744 N.W.2d 55 (2008). First, § 43-1505(4) provides an "active efforts" element:
Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.
Second, § 43-1505(6) provides a "serious emotional or physical damage" element:
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

(a) Grounds Under § 43-292
Section 43-292(2) provides that parental rights may be terminated when the parent has "substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." The Nebraska Supreme Court has said: "[P]arents may as surely neglect a child of whom they do not have possession by failing to put themselves in a position to acquire possession as by not properly caring for a child of whom they do have possession." In re Interest of L.C., J.C., and E.C., 235 Neb. 703, 713, 457 N.W.2d 274, 281 (1990). A parent's failure to provide an environment to which his or her children can return can establish neglect. See id.
The six older children were removed from the home in October 2005 because of inadequate housing conditions. The home was filthy, there was no running water, and the toilet was not working. Furthermore, the children were wearing filthy, soiled clothing and had severe head lice. The children were returned to Carmela in November 2006, because she had cleaned up her home and the utilities were reestablished. However, in May 2007, the children, including Charlotte, were returned to foster care, because Carmela had been evicted and the family had been living in her car. Carmela also admitted to a drug relapse. And while the children were in foster care, Carmela was inconsistent with her visits and would often not show up for visits, upsetting the children. At the time of the termination hearing, Carmela was unable to parent the children. She was in a chemical dependency treatment program and unable to provide a home for the *425 children at that time. While Carmela's beginning efforts at rehabilitation are laudable, the record reflects that she has repeatedly started treatment programs only to quit such programs prematurely. It is apparent that she has not conquered her methamphetamine addiction. Thus, not only was Carmela unable to provide a home for her children at the time of the hearing, there was no evidence as to when she would be able to provide a home for her children. And "[c]hildren cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." In re Interest of Walter W., 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008).
We find that grounds existed to terminate Carmela's parental rights under § 43-292(2). Thus, we would not ordinarily address the juvenile court's finding of grounds for termination under § 43-292(6) (parental rights may be terminated when "reasonable efforts to preserve and reunify the family if required under section 43-283.01, under the direction of the court, have failed to correct the conditions leading to the determination"). However, because this is an ICWA case, we do address whether the requisite active efforts were made.

(b) § 43-1505(4)Active Efforts
Both Chad and Carmela argue that the juvenile court erred in finding that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the family. Section 43-1505 requires in part:
(4) Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.
The Nebraska Supreme Court has said that the ICWA requirement of "active efforts" requires more than the "reasonable efforts" standard applicable in non-ICWA cases and that "at least some efforts should be `culturally relevant.'" In re Interest of Walter W., 274 Neb. at 865, 744 N.W.2d at 61. The term "culturally relevant" is not defined by Nebraska's administrative regulations, by the court in In re Interest of Walter W., or by any other appellate decision, Nebraska or elsewhere, that we can find. The evidence before us is that the oldest child, Alicia, attended a camp in Arizona for Native American children, but the problem with this family was the parents, not the children. While we realize that with seven children, this may seem a "nominal" effort, there is no real guidance in Nebraska case law as to what efforts are required. In In re Interest of Walter W., the Nebraska Supreme Court found that a "cultural plan" discussed with the foster motherwithout further elaboration about suchconstituted a sufficient active effort. 274 Neb. at 867, 744 N.W.2d at 62. In re Interest of Walter W. does not state what the threshold requirement is for a sufficient culturally relevant active effort. However, a recent decision from the Nebraska Supreme Court provides some additional context in which to assess focus and what the "target" of culturally relevant active efforts should be. The court said the following about the ICWA in In re Interest of Elias L., 277 Neb. 1023, 1029-30, 767 N.W.2d 98, 103 (2009):
Congress passed ICWA in response to the alarmingly high number of Indian children being removed from their families and placed in non-Indian adoptive or foster homes by state welfare agencies and courts. At the time of ICWA's enactment, 25 to 35 percent of all Indian children were removed and separated *426 from their tribes and families to be placed in adoptive or foster homes. To make matters worse, about 90 percent of Indian adoption placements occurred in non-Indian homes away from their culture and community.
Commenting on the loss of Indian culture, Congress noted that "[c]ontributing to this problem has been the failure of State officials, agencies, and procedures to take into account the special problems and circumstances of Indian families and the legitimate interest of the Indian tribe in preserving and protecting the Indian family as the wellspring of its own future." Ultimately, Congress enacted ICWA in response to the looming crisis facing Indian tribesnamely, that they would face extinction through the removal of their children through state court child custody proceedings. Congress concluded that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children." Thus, Congress designed the procedural and substantive standards of ICWA to "`protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.'"
In assessing the notion of culturally relevant active efforts in this case, we think it important to distill the application thereof to the parents, to the children, and to the family. Thus, beginning with the parents, the core problems of the parentsfilthy, unhealthy, and unsuitable living conditions, coupled with Carmela's addiction and Chad's incarcerationcannot be fairly characterized as arising from their Native American background. To characterize these parents' shortcomings as "cultural" shortcomings that can be addressed by "culturally relevant" active efforts smacks of stereotyping at best and racism at worst. Put another way, we see no nexus between Native American culture and either the parental shortcomings or the solution thereto.
Turning to the children and the family, there is some evidence that Carmela lived on a reservation at some point in her life. But, the children have never lived on a reservation, nor has the family unit, and according to the testimony of Evelyn Labode, the ICWA expert, the children's involvement with their Native culture was very limited. And, it is worth recalling that their tribe did not care to be involved in the case. The observation by the court in In re Interest of Walter W., 274 Neb. 859, 744 N.W.2d 55 (2008), that the cultural plan was discussed with the foster mother could be seen as suggesting that the required active efforts be directed at the children. However, it is the parental shortcomings that place the family at risk for breakup. Thus, while it may well be desirable to acquaint the children with their Native heritage, doing so seems unlikely to prevent the breakup of the family when it is the parents' shortcomings that caused the family to become involved in the juvenile justice system, and their failure to remedy such, that, in the end, caused the breakup of the family.
The Nebraska Supreme Court in In re Interest of Walter W. did hold that the "active efforts" standard requires a case-by-case analysis. As a prelude to that analysis, we find the Alaska Supreme Court's opinion in A.A. v. State, 982 P.2d 256 (Alaska 1999), helpful. That court, after noting the federal ICWA did not define "active efforts," distinguished between active and passive services:
"Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts, the intent of the drafters of the [ICWA], is *427 where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the [ICWA] would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child."
982 P.2d at 261.
The Oklahoma Court of Civil Appeals said that "active efforts" requires more than pointing the parent in the right direction, it requires "`leading the horse to water.'" See In re J.S., 177 P.3d 590, 594 (Okla.Civ.App.2008). Using the above concepts, it is apparent that Chad, Carmela, and the children were provided with a variety of active, as well as passive, efforts which were all aimed at preventing the breakup of this Native family, and which went far beyond merely pointing the parents in a certain direction. We now detail the efforts undertaken to prevent the breakup of this family.
When the six older children were initially removed from the home in October 2005, the State sent a notice to the Omaha Tribe within 1 week of such removal, inquiring whether the children were members of, or eligible for membership in, the tribe. DHHS provided Chad and Carmela with utility bill assistance for water and gas; a family support worker who helped them clean their home; pretreatment assessment and followup; a psychological evaluation for Carmela; a psychological evaluation for Chad, although such was only partial because Chad did not return to complete it; foster care placement for the children; chemical dependency evaluations; and bus tickets. Additionally, the children were provided with services: Alicia was provided tutoring, Louis was given a referral for tutoring, and Louis was diagnosed with a hearing problem for which a hearing aid was ordered.
When the six older children were returned to Carmela in November 2006, and all seven children were in Carmela's home, DHHS provided her with individual therapy, although Carmela was not consistent in attending her therapy sessions. Again, the children were also provided with services: Alicia and Louis received tutoring, and Unique was given a referral to early education services.
Beginning in May 2007, when all seven children were again placed in foster care, DHHS provided Carmela with assistance in locating housing, foster care placement for her children, supervised visitation, access to "Specialized Treatment and Recovery Court" (STAR Court), a chemical dependency evaluation, drug screening through urinalysis (UA), and individual therapy. We note that there were numerous times when DHHS and the service providers could not locate Carmela; however, when Carmela would resume contact, services were continued. The children were also provided with services: Alicia and Louis received tutoring; Henry received speech therapy; Alicia, Louis, Chad Jr., and Unique were evaluated for mental status examinations; and sibling visitation was provided. Thus, Carmela was clearly provided with active efforts throughout this case.
There was some evidence offered that supports Chad's and Carmela's argument that the performance of the family's social worker, Laurie Hultgren, was deficient at times. The evidence shows that Hultgren was at times difficult to contact for service referrals and that, at least for a time, she failed to make the required monthly visits with the children. On the record before us, it can be said that Hultgren's performance *428 was less than ideal. However, the record is also clear that numerous service referrals were made by Hultgren on behalf of Carmela and that Hultgren would oftentimes make new referrals for Carmela when Carmela was discharged for failure to participate in previous referrals or rehabilitation programs. Even though this is an ICWA case requiring "active efforts," which In re Interest of Walter W., 274 Neb. 859, 865, 744 N.W.2d 55, 61 (2008), says is "more than ... `reasonable efforts,'" that notion does not mean that Carmela is absolved of all responsibility to help herself. She must still avail herself of the services that are arranged for her. And after some period of time, she must, as a result of her engagement with and dedication to the effort being made for her by DHHS, become a functioning parent who can nurture her children and keep them healthy and safe. That she failed repeatedly to do so is clear from the record. Thus, it is hard to envision that better performance by Hultgren would have made a difference, given that the services provided to Carmela had little lasting impact on Carmela's ability to be an appropriate parent. Despite Hultgren's shortcomings, we find that Carmela was provided with active efforts as required by the ICWA.
Although the record does not disclose an exact date, Chad was arrested and incarcerated sometime between the children's initial removal from the home and September 19, 2006. Chad is housed at a federal penal institution on drug- and weapons-related convictions. Testimony indicates that Chad was sentenced to somewhere between 7 and 12 years' imprisonment. The evidence in our record shows that during his incarceration, the only service Chad was provided was therapeutic telephone visitation with the children, although it was unknown whether such visitation actually occurred. Pam Curry, a DHHS supervisor, testified that for incarcerated persons, any services would be offered through the institution. And Labode, the ICWA expert, testified that from the documentation she reviewed, parenting programs were available to Chad in the federal institution in which he is incarcerated. As said above, the "active efforts" standard requires a case-by-case analysis. In re Interest of Walter W., supra. Given that Chad is in a federal prison for 7 to 12 years, and that active efforts were clearly undertaken for the family before his incarceration and for the mother and children after Chad's incarceration, we find that under a "case-by-case" standard, the rehabilitative efforts with respect to Chad were sufficient under the ICWA. In so concluding, we rely on a substantial body of case law holding that if further efforts would be futile, the requirement of active efforts is satisfied. See, Wilson W. v. State, 185 P.3d 94 (Alaska 2008) (in child in need of care proceeding brought under ICWA, state is not required to keep up its active efforts to provide remedial services designed to prevent breakup of family once it is clear that these efforts would be futile); State ex rel. C.D., 200 P.3d 194 (Utah App.2008). See, also, People ex rel. K.D., 155 P.3d 634 (Colo.App.2007) (although state must make "active efforts" under ICWA, it need not persist with futile efforts); Letitia V. v. Superior Court, 81 Cal.App.4th 1009, 97 Cal.Rptr.2d 303 (2000) (additional remedial programs not required where prior efforts became futile and proved unsuccessful).
Curry testified that in her opinion, no additional services could be offered to this family in order to provide a possible reunification. And Labode testified that DHHS provided both parents with active efforts to prevent the breakup of the family. We agree and find that the evidence was sufficient to prove by the requisite standard, *429 clear and convincing evidence, that active efforts were undertaken to prevent the breakup of the family and that further efforts would be futile and are not required under the ICWA.

(c) § 43-1505(6)Serious Emotional or Physical Damage

(i) Continued Custody With Chad
Chad argues that the juvenile court erred in admitting witness Labode's opinion that continued custody of the children by Chad would likely result in serious emotional or physical damage to the children. The Nebraska Supreme Court has set forth the standard for qualified expert testimony in ICWA cases:
Pursuant to the ICWA, qualified expert testimony is required in a parental rights termination case on the issue of whether serious harm to the Indian child is likely to occur if the child is not removed from the home. See Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584,67,593 (1979) (not codified).
The Bureau of Indian Affairs sets forth guidelines under which expert witnesses most likely will meet the requirements of the ICWA: "(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices. (ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards in childrearing practices within the Indian child's tribe. (iii) A professional person having substantial education and experience in the area of his or her specialty." Id.

In re Interest of C.W. et al., 239 Neb. 817, 823-24, 479 N.W.2d 105, 111 (1992), disapproved on other grounds, In re Interest of Walter W., 274 Neb. 859, 744 N.W.2d 55 (2008). See, also, In re Interest of Phoebe S. & Rebekah S., 11 Neb.App. 919, 664 N.W.2d 470 (2003).
Labode earned bachelor's and master's degrees in French and education. She also has a juris doctor degree from Creighton University School of Law. Labode is a retired assistant professor at the University of Nebraska-Lincoln Center on Children, Families, and the Law. While she was an assistant professor, Labode developed curriculum for the training of protection and safety workers in the areas of child welfare and juvenile justice, specializing in Indian child welfare, adoption, cultural issues, and permanency planning; delivered training on child welfare and juvenile justice issues for state and private agencies such as DHHS, the Nebraska Children's Home Society, the Lincoln Commission on Human Rights, and the Anti-Defamation League; and researched child welfare and juvenile justice issues, particularly Indian child welfare, adoption, cultural competency, and permanency.
After retiring from the University of Nebraska in January 2005, Labode continued working as a training consultant and curriculum developer. In such work, she trained protection and safety workers on ICWA, adoption, and cultural issues; developed a curriculum for protection and safety workers on ICWA, adoption, and cultural issues; and was a resource for state and private agencies in the area of Indian child welfare. Labode is a member of the Nebraska State Bar Association, Midlands Bar Association, and the National Indian Child Welfare Association. She is also affiliated with the permanency planning task force, charged by the Nebraska Supreme Court with promoting permanency for children. Labode was also a founding member of the Native American Foster and Adoptive Coalition, now defunct. *430 Additionally, Labode has given numerous presentations on the "Native American cultural plan" and the ICWA. Labode also testified that she has been an ICWA witness in several cases.
"Whether a witness is qualified to testify as an expert under the Nebraska Evidence Rules, which serve as a guidepost in termination of parental rights cases, is a preliminary question of admissibility for a trial court under Neb. Evid. R. 104(1), Neb.Rev.Stat. § 27-104(1) (Reissue 1995)." In re Interest of Phoebe S. & Rebekah S., 11 Neb.App. at 935, 664 N.W.2d at 482. Such a determination will be upheld on appeal unless the trial court's finding is clearly erroneous. Id. Clearly, Labode has substantial education and experience that makes her qualified to render the opinions she offered in the trial of this matter which proceeded under the ICWA. Thus, the trial court's admission of her testimony was not clearly erroneous.
We note that Chad's arguments indicate an incorrect reading of the operative statute, § 43-1505(6), which provides:
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
While the statute does require proof beyond a reasonable doubt and also requires "testimony of qualified expert witnesses," this heightened standard of proof is not extended to all elements of an ICWA parental rights termination case, see In re Interest of Walter W., 274 Neb. 859, 744 N.W.2d 55 (2008), and specifically, the heightened standard of § 43-1505(6) does not apply to the state law elements under § 43-292 for terminating parental rights. Nor must the State prove the best interests element of an ICWA parental rights termination case beyond a reasonable doubt. Id. Rather, the State must prove by clear and convincing evidence that terminating parental rights is in the child's best interests, but such evidence need not include testimony of a qualified expert witness. Id. But, such evidence can, of course, include the testimony of a qualified expert such as Labode.
Labode testified that Chad has not had much contact with the children since his incarceration and that, in fact, it appears that he has written only one letter to each child, excluding Charlotte. Labode testified that in her opinion, if the children were returned to Chad, they would endure emotional and physical harm, because it appears that the children were exposed to the drug culture (the police found drug pipes in the home where the children were) and because Chad's psychological evaluation was not very informative (he gave "very curt" responses to parenting questions), causing the therapist to be unable to form opinions about Chad's parenting style and his willingness to parent his children. Labode also noted that Chad has had opportunities to contact his children, but the only letters were written 2 years prior to the termination hearing.
Nikki Conner, a licensed mental health practitioner, testified that in November 2005, she worked for a mental health services facility and did a pretreatment assessment of Chad. Her pretreatment assessment report, which was received into evidence, stated that Chad was referred for services following the removal of his six children due to chronic unsanitary living conditions, chronic head lice of all the children, chronic unemployment, and possible methamphetamine use. Conner testified that the ultimate goal for Chad was reunification and to address mental health and *431 substance abuse issues. She recommended family therapy and outpatient substance abuse treatment. Conner stated that a "red flag" regarding Chad was that he denied any substance abuse. She stated she was concerned that without treatment, the behavior and patterns in the family would remain the same.
Based on the totality of the evidence presented at the termination hearing, it is clear beyond a reasonable doubt that custody of the children by Chad, after he would be released from incarceration, whenever that might occur, is likely to result in serious emotional or physical harm to the children. Chad is currently incarcerated, and obviously, it will be a number of years before he would be in a position to physically have custody of the children, putting aside for the moment his past serious neglect of the health and safety of the childrenwhich hardly bodes well for the future. Additionally, at the time of the termination hearing, the children had already been in foster care for 30 of the previous 36 months. And "[c]hildren cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." In re Interest of Walter W., 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). This concept is fully applicable in an ICWA parental rights termination case. We find after our de novo review that the evidentiary requirements of § 43-1505(6) have been satisfied and that Chad's parental rights to all of his children involved herein should be terminated.

(ii) Continued Custody With Carmela
Carmela argues that the juvenile court erred in finding that her continued custody of the children would likely result in serious emotional or physical damage to the children. Labode testified that in her opinion, if the children were returned to Carmela, they would endure emotional and physical harm, because at the time of removal, the children had head lice, the school-age children had been absent 50 days and tardy more than 20 days, and two of the children had hearing or communication difficulties. Labode testified that while Carmela did "wonderful things" to get the children returned, within 6 months, the children's welfare had deteriorated, Carmela was not able to maintain a home, and Carmela called DHHS to take the children because she had been evicted. At this point, Carmela left counseling and residential treatment and has been unable to keep a job; and Carmela has been inconsistent with her visitation.
Jennifer Lindner, a licensed psychologist, testified that she was Carmela's therapist from October 2006 until July 2007, when Lindner went on maternity leave. Lindner also tried to contact Carmela in October 2007, when Lindner returned to work, but was unsuccessful. Carmela contacted Lindner again in January 2008 to resume services, but Lindner needed payment approval from DHHS. Lindner testified that she has had no contact with Carmela since January 2008. Lindner testified that while seeing Carmela from October 2006 until July 2007, she wanted to meet with Carmela weekly. However, Carmela was inconsistent in meeting with Lindner and missed a total of 14 appointments. Lindner was able to meet with Carmela 17 times. Lindner testified that Carmela would make progress, but then she would miss appointments and come back with new issues or Carmela's symptoms would worsen. Lindner testified that she was not sure Carmela would make enough progress to function effectively as a parent, be able to address her mental health symptoms, or be able to function in regular society.
*432 Eva Abrams, a supervisor at Owens and Associates, testified that Owens and Associates provided Carmela with visitation and family support services. Abrams testified that Carmela was inconsistent with her participation with Owens and Associates and that in August 2007, Owens and Associates discharged Carmela for lack of participation. Between May and August 2007, there were 19 scheduled family support sessions, but Carmela attended only 5. Abrams testified that Owens and Associates received a new referral for Carmela on July 23, 2008, and supervised visits were scheduled but never took place Carmela was again discharged on September 6 for not contacting Owens and Associates for 30 days.
Tayla Dickey, a child and family services supervisor for DHHS, testified that prior to being a supervisor, she was a protection and safety worker working specifically with STAR Court. Dickey testified that STAR Court is a voluntary program and has three phases. During phase one, participants go to court every week, attend Alcoholics Anonymous (AA) or Narcotics Anonymous (NA) meetings, begin treatment or get evaluations, submit to UA's three times per week, and follow other court orders. During phase two, participants go to court every other week, continue UA's, and work toward graduating from treatment. During phase three, which occurs after they have graduated from treatment, participants go to court once per month.
Dickey testified that Carmela started with STAR Court on September 4, 2007, and had to immediately do a UA because of an admitted methamphetamine relapse. Carmela was ordered to attend seven AA or NA meetings each week because she was unemployed at the time. Carmela was also ordered to have an updated chemical dependency evaluation. Dickey testified that Carmela participated with STAR Court for 3 weeks, at which time she was unsuccessfully discharged, because she left her treatment program against medical advisement; after leaving the treatment program, her whereabouts were unknown; she missed court on September 18; she did only the initial UA even though she was supposed to do three each week; and she did not provide proof of attending AA or NA meetings.
The children's foster mothers testified that Carmela would frequently miss visits and that the children would be upset and disappointed. The foster mothers stated that some of the children would cry and others could not understand why they could not see Carmela.
Curry, a DHHS supervisor for child abuse cases, testified that the children were returned to Carmela's care from the fall of 2006 until May 2007. In May 2007, the children were returned to foster care. After May 2007, Carmela was not consistent with visitations, and as a result, the visitations were reduced. Curry testified that Carmela had begun drug treatment programs on more than one occasion, but did not successfully complete such programs. Curry also testified that Carmela was not consistent with individual therapy, had avoided UA's, and had had "scattered" employment.
Based on the totality of the evidence presented at the termination hearing, it is clear beyond a reasonable doubt that continued custody of the children by Carmela is likely to result in serious emotional or physical harm to the children. The cycle of starting and failing therapeutic programs, or withdrawal from such, plus the absence of the required UA's make it apparent either that Carmela has chosen methamphetamines over her children or that her addiction makes it impossible for her to choose her children rather than *433 drugs. At the time of the termination hearing, the children had already been in foster care for 30 of the previous 36 months, and as we said with reference to Chad, we cannot suspend these children indefinitely in foster care while Carmela tries to gain what is obviously very uncertain parental maturity, abilities, and commitment. See In re Interest of Walter W., 274 Neb. 859, 744 N.W.2d 55 (2008).

3. BEST INTERESTS
The evidence is clear that it is in the best interests of the children that both Chad's and Carmela's parental rights be terminated. Chad is incarcerated, and will be incarcerated for quite some time, on drug- and weapons-related convictions, and he has had little contact with the children since his incarceration. And Carmela, after initially getting her children back, has relapsed with drug use. She has failed to complete therapy or treatment programs, has avoided UA's, and has not been consistent in visiting her children. Labode and Curry both testified that it would be in the children's best interests that parental rights be terminated. We agree. At the time of the termination hearing, the children had already been in foster care for 2½ of the previous 3 years. And as we have said previously in this opinion, "[c]hildren cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." In re Interest of Walter W., 274 Neb. at 872, 744 N.W.2d at 65. These children need a safe, permanent home, and unfortunately, Chad and Carmela cannot provide them with such.

V. SUMMARY AND CONCLUSION
Chad does not appeal the § 43-292 statutory grounds for termination of parental rights, or that such termination was in the children's best interests. His grounds for appeal lie strictly with the additional requirements of the ICWAactive efforts and proof of serious emotional or physical harm. As stated previously, we find that active efforts were made and that the children would suffer serious emotional or physical harm if Chad retained custody. Therefore, we affirm the decision of the juvenile court terminating Chad's parental rights to these children.
As for Carmela, we find that the State has proved the § 43-292 statutory grounds for termination of parental rights, that active efforts were made, that the children would suffer serious emotional or physical harm if she retained custody, and that termination of Carmela's parental rights is in the children's best interests. Therefore, we affirm the decision of the juvenile court terminating Carmela's parental rights to these children.
AFFIRMED.