IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE INTEREST OF BENTLY C. & ALIANNA C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BENTLY C. AND ALIANNA C.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JULIANNA O., APPELLANT.

Filed August 25, 2020.    Nos. A-19-1161, A-19-1162.

Appeals from the County Court for Buffalo County: GERALD R. JORGENSEN, JR., Judge. Affirmed.

Vikki S. Stamm, of Stamm Romero & Associates, P.C., L.L.O., for appellant.

Mandi J. Amy, Deputy Buffalo County Attorney, for appellee.

MOORE, Chief Judge, and BISHOP and WELCH, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Julianna O. appeals from the order of the Buffalo County Court, sitting in its capacity as a juvenile court, terminating her parental rights to her children, Bently C. and Alianna C. The juvenile court found that the State had proven grounds for termination of Julianna's parental rights to both children under Neb. Rev. Stat. § 43-292 (Reissue 2016) and that termination of her parental rights was in the children's best interests. The court also found that Alianna was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016); Bently had previously been adjudicated under this statute. Following our de novo review of the record, we affirm.

- 1 -

BACKGROUND

Julianna is the mother of Bently, born in February 2016, and Alianna, born in January 2018. She is also the mother of three older children: Neveah, Brooklyn, and Jaxon. These children are not part of the present case, and were in guardianship placements at the start of the present proceedings. Neveah's guardianship was dissolved in August 2018 when her guardian could no longer care for her, and due to the case involving Bently, Neveah was placed in the Department's custody. There was evidence about the older children presented at the termination of parental rights proceedings with respect to Bently and Alianna, and we discuss them as necessary to the resolution of the present appeal. Jeffrey C. is the father of Bently and Alianna (he is also Jaxon's father). His parental rights to Bently and Alianna were also terminated in the present proceedings, but he is not involved in this appeal. We discuss him only as necessary to the resolution of Juliana's appeal.

Bently was removed from Juliana's care in February 2018 after law enforcement placed him "in an emergency hold" due to Julianna testing positive for methamphetamine at the time of his birth; Bently's meconium tested positive for amphetamines. Julianna left Nebraska for a time while pregnant with Alianna, who was born in North Carolina. Alianna was removed from Julianna's care on February 1, 2019, shortly after Julianna's return to Nebraska. Both children were placed in out-of-home placements at the times of their respective removals and have not returned to Julianna's care since those dates. Bently was initially placed for a few days with Jeffrey's ex-wife who had guardianship of Jaxon, but when he was a week old, Bently was placed with his current foster parents. Alianna was placed with the same foster parents as Bently when she was 4 weeks old.

On February 16, 2018, the State filed a petition alleging that Bently was a child within the meaning of § 43-247(3)(a) and lacked proper parental care due to the fault or habits of Julianna. In the accompanying motion and affidavit for emergency placement, the State asserted Bently had been exposed to amphetamines and methamphetamine upon his birth as Julianna had tested positive for these substances. The court entered an ex parte order placing Bently in the temporary custody of the Nebraska Department of Health and Human Services (Department). The State filed a supplemental petition on June 14, 2018, adding allegations with respect to Jeffrey.

A first appearance/adjudication hearing on the original petition was held on February 28, 2018. The juvenile court explained the parties' rights, the possible dispositions, and possible consequences of the case, including the possibility of termination of parental rights. Julianna entered an admission to the allegations of the petition, and the court adjudicated Bently as a child within the meaning of § 43-247(3)(a). The court's journal entry and order provided that reasonable visitation was to be determined by the Department and continued Bently's out-of-home placement.

Following a dispositional hearing on April 16, 2018, the juvenile court ordered the parties to comply with the Department's case plan and court report received at the hearing and continued Bently in the Department's custody and out-of-home placement. The permanency objective at that time was reunification. The first goal of the case plan was for Julianna to exhibit healthy parenting decisions, including following recommendations made by medical professionals, finding alternative ways to cope when tempted to use drugs, and attending therapy to help with past trauma. The strategies to meet that goal were that Julianna would obtain substance use and mental health

- 2 -

evaluations and follow the recommendations of those evaluations and that she would begin individual therapy to work on past trauma and learn better ways to cope than through substance use. The second goal of the case plan was that Julianna would provide consistent parenting, by means including maintaining a safe and stable home, providing age appropriate supervision, and providing for Bently's needs. Strategies to meet that goal were providing a consistent home for Bently, contacting "the SAFE center" and obtaining tools and resources to address domestic violence, maintaining employment and/or resources to provide basic necessities for Bently, and working with family support on budgeting, prioritizing her needs from her wants, and a parenting class.

Following a hearing on July 16, 2018, the juvenile court adjudicated Bently under the allegations of the supplemental petition, continued Bently in the Department's custody and out-of-home placement, and ordered the parties to comply with the provisions of the case plan offered at that hearing. The case plan goals and permanency objective remained the same. An updated court report and case plan were received by the court at a review hearing on November 20. The permanency goal with respect to Bently at that time was reunification with a concurrent plan of adoption. The case plan goals remained essentially the same, although wording was added to address Neveah who was in the Department's custody by that point. Julianna did not appear, but she was represented by counsel at the November review hearing.

On January 31, 2019, the State filed a petition in juvenile court alleging Alianna was within the meaning of § 43-247(3)(a) and lacked proper parental care due to the fault or habits of both Julianna and Jeffrey. The State alleged that Alianna was at risk for harm because her parents had a prior child (Bently) in the Department's custody due to his exposure to methamphetamine and had failed to comply with services to achieve reunification, as well as an older child in a private guardianship (Jaxon) for whom they were not providing care; that Julianna failed to comply with services to achieve reunification with her older child (Neveah) who was then in the Department's custody, and that she also had another older child (Brooklyn) who was in a private guardianship; that both parents had a long history of methamphetamine use and that Julianna had admitted to use during her pregnancy; and that both parents had a history of domestic violence. The State also filed a motion for ex parte temporary custody, seeking Alianna's removal from her parents' care, which was granted by the court.

On February 7, 2019, Julianna filed a motion to dismiss Alianna's case, representing that Alianna did not lack proper parental care because Julianna had placed Alianna in a temporary guardianship with Julianna's mother. Julianna appeared at a hearing on February 13, and the juvenile court explained her rights and the possible dispositions and consequences of the case, including the possible filing of a motion to terminate Julianna's parental rights. Julianna acknowledged her understanding of the court's advisements; she also filed a written denial of the allegations and an acknowledgment of her rights in Alianna's case. The court subsequently denied Julianna's motion to dismiss.

Julianna did not appear at a review and permanency hearing held on March 11, 2019, in Bently's case, but she was represented by counsel at that hearing. The case plan received at that hearing indicated that the permanency objective with respect to Bently remained reunification with a concurrent plan of adoption; it also identified a plan of reunification with respect to Alianna. The

case plan goals and strategies remained the same as those of the previous case plan. During the hearing, the State indicated that it was "looking at filing a termination of parental rights" in Bently's case due to the lack of progress. The guardian ad litem agreed that "it's looking like termination is going to be in the best interests for Bently" due to the parents' lack of progress in addressing their substance abuse issues. He also expressed support for a permanency plan of adoption by Bently's foster parents. The juvenile court's journal entry and order following the March 11 hearing reflected that the permanency goal had been reunification/adoption and ordered the continuation of those goals.

On March 20, 2019, the State filed motions for termination of parental rights with respect to both parents in both cases. In Bently's case, the State alleged grounds for termination of Julianna's parental rights under § 42-292(2), (4), (6), and (7) and that termination of her parental rights was in Bently's best interests. In Alianna's case, the State alleged grounds for termination of Julianna's parental rights under § 42-292(2), (4), and (6) and that termination of her parental rights was in Alianna's best interests.

A preadjudication hearing was held in Alianna's case on March 30, 2019. Julianna appeared with her attorney at the hearing. The juvenile court's journal entry and order from that date indicates that the court was setting aside previously discussed dates that the parties had all agreed would work for trial on the motions to terminate parental rights. On April 23, the court entered denials to the motions to terminate on behalf of both parents, neither of which was present at that hearing, although they were both represented by counsel.

The termination hearing for both children (and adjudication for Alianna) began on May 13, 2019; continued on May 24, June 6, and July 15; and concluded on July 30. The court reviewed the allegations of the termination motions with both parents during the course of the termination hearing, and they indicated their understanding of them. The court also explained the parents' rights, and they indicated their understanding of those rights as well as affirming the denials previously entered on their behalf.

The juvenile court heard testimony from multiple witnesses and received numerous documentary exhibits, including the case plans referenced above, criminal records for both Julianna and Jeffrey, and documentation from cases involving Julianna's older children.

The criminal records for Julianna admitted into evidence include various convictions between 2006 and 2017 for third degree domestic assault first offense, obstructing a police officer, driving under the influence, third degree assault (mutual consent), driving under suspension, theft, and shoplifting, for which she received fines and jail sentences.

Additionally, on March 16, 2016, Julianna was sentenced to 30 months' probation for third offense shoplifting, a Class IV felony, which required her to submit to drug testing at the request of her probation officer. Various probation violations were filed on Julianna, but each time, Julianna was again placed on probation, although by the time of the termination trial, her probation had been revoked and she had an upcoming sentencing hearing. According to probation officer Rod Diehl, Julianna was scheduled for testing twice a month, but she did not report for testing consistently. From March 2016 through February 2019, Julianna submitted to testing six times and had four positive tests for methamphetamine. According to Diehl, he communicated with Julianna's Department caseworker about the lack of compliance with the drug testing required by

probation. The Department caseworkers who testified indicated that the Department does not drug test if someone is under an order to test through probation, as was the case here. The primary Department caseworker had communication difficulties with Diehl; she relied on Julianna's reports that she was testing and did not fully learn of the limited amount of testing completed by Julianna through probation until after Julianna's return from North Carolina.

On April 13, 2019, Julianna was stopped while driving for having no license plates and no in-transit papers. Her driver's license was suspended at the time. The deputy who stopped Julianna did not do a driving under the influence investigation, but because of something Julianna said to Jeffrey, who arrived after the stop, the deputy became suspicious that there were drugs in the vehicle. The car was taken to impound, and when it was inventoried, the deputy found a small baggie of methamphetamine. At the time of the termination trial, that case had not been resolved.

Multiple witnesses testified about Julianna's drug use and the domestic violence between Julianna and Jeffrey. The therapist who counseled Julianna's daughter Brooklyn from December 2016 to September 2018 testified that she met with Julianna during this period. Julianna informed the therapist that she had been using methamphetamine on and off for 15 years and that there was domestic violence in her relationship with Jeffrey. During Brooklyn's counseling sessions she related having observed instances of domestic violence between Julianna and Jeffrey.

Brooklyn's guardians, Ellen D. and Neil D., also testified about the drug use and domestic violence issues. Brooklyn was initially placed in foster care with them in May 2012 when she was 8 months old, but she was returned to Julianna's care in September 2013. According to Ellen, Julianna was not always consistent in her visitation during this period, but "when [Julianna] was present and consistent," Ellen had no concerns with her parenting. Julianna dropped Brooklyn off with the couple on several occasions for extended periods after reunifying with Brooklyn, and Brooklyn has resided with them since October 2016. They received guardianship of Brooklyn in 2017. Ellen expressed concerns about the physical violence in Julianna's relationship with Jeffrey. Julianna left Brooklyn with the couple for extended periods in the summers of 2015 and 2016 when she was in jail. When she left Brooklyn with them the final time in October 2016, she indicated that she was using drugs again, the domestic violence was getting worse, and she wanted Brooklyn out of that situation. At that time, Julianna told Ellen she had used drugs since she was 16 years old. Since leaving Brooklyn with the couple in October 2016, Julianna has provided gifts on a few occasions but no financial support. Neil described an incident prior to October 2016 when Julianna and Jeffrey had a fight that led to police involvement and Julianna being very fearful of Jeffrey's behavior. Neil indicated that Julianna had told him of both physical and verbal abuse in the family home. Julianna and Jeffrey both informed him of their drug use at various points.

The Court Appointed Special Advocate (CASA) for the children in this case testified that during a visitation observation in August 2018, Julianna told her about a recent fight with Jeffrey. Julianna was pregnant with Alianna at the time. The fight resulted in Julianna being locked out of the house and sleeping in her car. The CASA took Julianna to "The S.A.F.E. Center," where she could stay for 30 days, but the CASA understood that Julianna had either "check[ed] herself out or was kicked out a week later."

Bently and Arianna's foster father described a domestic violence incident he witnessed when Jeffrey and Julianna arrived at a church for a visitation in April 2018. The incident involved

Jeffrey accelerating and then quickly stopping a vehicle while Julianna was reaching inside. Julianna broke a window on the vehicle, cutting herself. Jeffrey exited the vehicle, yelling about Julianna's drug use, while she ran toward the church. Jeffrey got back into the vehicle and drove off before the police were called. A visitation worker took Bently inside the church during the incident.

Prior to this case, Julianna completed inpatient drug treatment in 2007 and again in 2017. Julianna attempted another inpatient treatment program in 2017 or 2018, but she was discharged unsuccessfully after 2 weeks. Julianna unsuccessfully attempted intensive outpatient treatment (IOP) at the end of February 2018, shortly after Bently's birth, attending only the orientation session for that program. During this case, Julianna completed substance abuse evaluations in May 2018, and January 2019, both of which recommended IOP and diagnosed severe methamphetamine dependence, cannabis use disorder, and a depressive/anxiety disorder. Julianna enrolled in but did not complete IOP in June 2018, being removed from the group after she "no-showed" for the first two sessions. She started IOP again at the end of March 2019, attending a few classes, but she left the group and did not return to a session in which the facilitator announced a drug test. She had another unsuccessful attempt at IOP in May.

The children's foster mother testified about Bently's health and issues with visitation. Initially, Bently had reflux and other stomach issues, and he still had certain dietary restrictions by the time of trial. Because of these issues, Bently used special bottles and formula. According to the foster mother, Julianna's visitation attendance has been inconsistent, and some visits have started late or ended early. Julianna's visitation attendance was still inconsistent after Alianna's birth and Julianna's return to Nebraska. There have been times, however, when Julianna attended consistently enough to have her visitation hours increased. For the most part, Julianna provided necessary items for visits although there were sometimes issues with Julianna being resistant to using the correct bottle or documenting the amount of formula given during visits.

The testimony of other witnesses confirmed that while Julianna's parenting was generally good when she attended visitation, her attendance was inconsistent. On March 29, 2018, Futures Family received a referral to provide supervised visitation for Julianna and Bently 5 times a week, as well as family support services. According to Tami Gangwish, the chief executive officer of Futures Family, Julianna was inconsistent in visitation attendance, and visitation hours were reduced or increased depending on her level of consistency. Between April and November 2018, Julianna attended 60 out of 154 scheduled visits, and there were occasions when she arrived late or ended her visits early. Her visitation was placed on hold in December 2018 due to her lack of contact and resumed at the end of February 2019. From February through May, she attended 7 out of 49 scheduled visits. Gangwish supervised only a few of Julianna's visits, and she testified that there were no parenting issues or safety concerns during the visits she did supervise. Julianna responded appropriately to Bently and required no parenting directions from Gangwish. Because of attendance issues, Julianna was required to call-in ahead of time to verify each visit and indicate whether she needed transportation.

During family support sessions, Gangwish worked with Julianna on organization, time management, a parenting class, and any resources needed for Julianna to complete her case plan goals. Before leaving Nebraska, Julianna had completed seven out of eight chapters in the Circle

of Security parenting class. Gangwish indicated that she spoke briefly with Julianna in February 2019 about completing the class, explaining that Julianna would need to review the already completed material before proceeding with the final chapter. Julianna is approved for further family support sessions, but none have occurred since her return to Nebraska. The testimony of the other visitation and family support workers was consistent with Gangwish's testimony. The primary Department caseworker observed about seven visits and did not have concerns during those visits.

Both Julianna and Jeffrey testified. Julianna has generally lived with Jeffrey in Wood River, Nebraska, during this case, except for the period she spent in North Carolina, although there have been times when she did not stay at the residence. The ownership of the residence is not clear from the record. Julianna was not employed at the time of her testimony. According to Julianna, she was last employed 2 or 3 months prior at a factory job where she had worked for a couple of months. She worked at Subway in 2018 for less than a year. In her testimony, she also referenced being hired to work at a gas station after Bently's birth but not pursuing that employment because of the current distractions in her life. She also referenced a couple of hotel jobs prior to working at Subway. Julianna testified about her difficulties in completing IOP, citing scheduling conflicts and indicating generally that she had difficulties with trust. She and Jeffrey have been in a relationship for approximately 5 years. Julianna acknowledged the domestic violence issues in their relationship, but she indicated that it would be difficult for her to leave him because she loved him. In his testimony, Jeffrey made it clear that although he and Julianna were currently in a relationship, he was no longer interested in continuing it.

The primary caseworker, Samantha Bogers, testified about her concerns with reunification based on Julianna's lack of compliance with the case plan. Bogers had recommended domestic violence classes due to the couple's history. Jeffrey indicated he would pursue an online class but did not follow through with providing Bogers information about the class. Julianna told Bogers that probation would set up a class for her but because Diehl was no longer with probation, Bogers was unsure whether that was still something that would be "followed through on probation's end." Bogers testified that the Department was recommending termination of parental rights for both parents. With respect to the first goal of Julianna's case plan, Bogers testified that Julianna had not followed recommendations of medical professionals, completed IOP, received medication management, or received individual counseling. Likewise, Julianna had not met the second goal of her case plan as she had not maintained consistent housing, did not always bring her own supplies to visits, and did not always provide age-appropriate supervision of or activities for Bently during visits. Additionally, Julianna did not follow through with "The S.A.F.E. Center," maintain employment, or complete the parenting class she started.

On November 18, 2019, the juvenile court entered an order terminating the parental rights of both parents to both children. In its order, the court observed that at the close of the termination hearing, Bently had been in out-of-home placement for 17 months and Alianna had been in out-of-home placement for 6 months. The court made findings about Julianna's parenting and the services provided to her by the State, and it concluded that the evidence "overwhelmingly" showed that Julianna had substantially and continuously or repeatedly neglected the children or refused to given them necessary parental care and protection, that reasonable efforts to preserve and reunify

the family had failed to correct the conditions leading to the adjudication of the children, and that Juliana was unfit by reason of her habitual use of narcotic drugs. The court also determined that the evidence showed "quite clearly" with respect to Julianna that Alianna was a child within the meaning of § 43-247(3)(a). Finally, the court concluded that termination of Juliana's parental rights was in the children's best interests.

## ASSIGNMENTS OF ERROR

Julianna asserts, reordered and restated, that the juvenile court erred in (1) finding that the State had proven grounds for termination of her parental rights under § 43-292(2) and (4), (2) finding that the Department had provided reasonable efforts, (3) finding that termination of her parental rights was in the children's best interests, (4) failing to make a finding following the March 2019 permanency hearing in Bently's case that a motion to terminate was going to be filed and keeping the permanency goal as reunification/adoption, and (5) not specifically adjudicating Alianna's case separately from the termination matter.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Vladimir G.*, 306 Neb. 127, 944 N.W.2d 309 (2020). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

*Statutory Grounds for Termination.*

The juvenile court found clear and convincing evidence to support termination of Julianna's parental rights under § 43-292(2) (substantial and continuous or repeated neglect), (4) (parental unfitness due to drug use), and (6) (failure of reasonable efforts to correct conditions leading to adjudication). It also found that at the close of the termination hearing, Bently had been in out-of-home placement for 17 months. See § 42-292(7) (grounds for termination when juvenile has been in out-of-home placement for 15 or more months of most recent 22 months). Julianna asserts that the juvenile court erred in finding that the State had proven grounds for termination of her parental rights under § 43-292(2) and (4). She also asserts in connection with § 43-292(6) that the court erred in finding that the Department had provided reasonable efforts, and she presents arguments relating to § 43-292(7).

In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the children's best interests. *In re Interest of Donald B. & Devin B.*, 304 Neb. 239, 933 N.W.2d 864 (2019). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Zachary D. & Alexander D.*, 289 Neb. 763, 857 N.W.2d 323 (2015).

In this case, the juvenile court found grounds for termination of Julianna's parental rights to both children under § 43-292 (2) and (4); to both children under § 43-292 (6), although Alianna

had not been adjudicated previously; and to Bently under § 43-292(7). Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Julianna's parental rights to both children under § 43-292(2).

Section 43-292(2) requires proof that "[t]he parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." The questions of what constitutes neglect and necessary parental care and protection are generally determined on a case-by-case basis, but common factual patterns include parental incarceration, adjudication, involuntary termination, or relinquishment of previous children, unsanitary house and unkempt children, or addiction to drugs or alcohol. See *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017). Parents may as surely neglect a child of whom they do not have possession by failing to put themselves in a position to acquire possession as by not properly caring for a child of whom they do have possession. *In re Interest of Louis S. et al.*, 17 Neb. App. 867, 774 N.W.2d 416 (2009), *abrogated on other grounds*, *In re Interest of Zylena R. & Adrionna R.*, 284 Neb. 834, 825 N.W.2d 173 (2012). A parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2). *In re Interest of Joseph S. et al., supra*.

In this case, Julianna has failed to put herself in a position to acquire possession of Bently and Alianna, who were both placed in the Department's custody due to Julianna's drug use. Although Julianna clearly loves her children and generally had good interactions with them during visits, the record shows a history of inconsistency and failure to follow through on recommendations and failure to take advantage of the opportunities provided to her in this case. Julianna has been provided with resources to address her issues with addiction, domestic violence, and mental health, but has not engaged with those resources in such a way as to be any closer to having the children returned to her care than she was at the points when they were removed. Julianna has not maintained employment and has continued to behave in ways that lead to contact with law enforcement. While there is little evidence to substantiate her actual drug use during the course of this case, Julianna has clearly avoided fully participating in testing which might clarify such use. She has admitted to various individuals her long-standing use of methamphetamine. The record shows clear and convincing evidence of neglect under § 43-292(2).

The juvenile court also found sufficient evidence to support termination under § 43-292(4) and (6), as well as § 43-292(7) with respect to Bently, but we do not need to consider whether termination of Julianna's parental rights was proper pursuant to those subsections since any one of the 11 statutory conditions identified in § 43-292 can serve as the basis for the termination of parental rights when there is also clear and convincing evidence that termination is in the children's best interests. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

*Reasonable Efforts.*

Julianna argues that the State failed to provide her with reasonable efforts to reunify with her children. However, reasonable efforts to reunify a family are required under the juvenile code

only when termination of parental rights is sought under subsection (6) of Neb. Rev. Stat. § 43-292. See *In re Interest of Mya C. et al.*, 23 Neb. App. 383, 872 N.W.2d 56 (2015). Here, because we find that termination of Julianna's parental rights was proper under § 43-292(2), we do not need to consider whether termination was proper under subsection (6) for failure of Julianna to comply with reasonable provisions in a rehabilitation plan. See *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001) (under subsection (2) of § 43-292, termination of parental rights does not require proof that parent failed to comply with rehabilitation plan). We need not address this assigned error further.

*Best Interests and Unfitness.*

Julianna asserts that the juvenile court erred in finding that termination of her parental rights was in the children's best interests.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Jahon S., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S., supra*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

As discussed above, the record shows a lack of engagement in the case plan by Julianna. Contrary to her assertions, she was provided with numerous resources by the Department and simply chose not to engage. Although we do not doubt the difficulty of overcoming a significant drug addiction, complicated by issues of domestic violence and mental health matters, the Department can do little to force someone to take advantage of the resources offered. Julianna displayed a lack of inconsistency in her engagement in this case and simply did not place herself in a position to be reunited with her children during the course of this case. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S., supra*. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). We conclude that the State showed by clear and convincing evidence that Julianna was unfit and that termination of her parental rights was in the children's best interests.

*Necessity of Finding Regarding State's*
*Intent to File Termination.*

Julianna asserts that the juvenile court erred in failing to make a finding following the March 11, 2019, permanency hearing in Bently's case that a motion to terminate was going to be filed and keeping the permanency goal as reunification/adoption. Julianna cites Neb. Rev. Stat. § 43-1312(3) (Reissue 2016), which requires a juvenile court to conduct a permanency hearing for a child in foster care no later than 12 months from the date the child entered foster care and annually thereafter. According to that statute, at a permanency hearing, the court must determine whether the permanency plan is appropriate and, when applicable, determine whether the child will be returned to the parent, referred to the State for termination of parental rights, placed for adoption, or referred for a guardianship. *Id.* Julianna argues, apparently based on the State's representation at the March 11 hearing that it was "looking at filing a termination of parental rights" in Bently's case, that § 43-1312(3) required the juvenile court to make a finding that Bently's case was being referred to the State for termination of parental rights. She argues further that the lack of such a finding did not put her on notice that she was about to have her parental rights terminated.

In our de novo review of the March 2019 order, we do not see that the juvenile court failed to make any of the findings required by § 43-1312(3). In its order, the court noted that the permanency goals for Bently had been reunification/adoption, and it ordered the continuation of those goals. The court found that the provisions of the case plan received at the hearing were reasonably material to eliminating the situation or condition which had led to Bently's adjudication, and it adopted the case plan and ordered the parties to comply with its provisions. The court found that the State had made reasonable efforts to finalize the permanent placement of Bently, including visitation, phone calls, family team meetings, agency supported foster care, Medicaid, individual and family therapy, an on-going case management toward the permanency objective of reunification with a concurrent plan of adoption. Although the order does not mention that the State was contemplating filing termination proceedings, § 43-1312(3) does not require the court to document every discussion that occurred at the permanency hearing, and as Bently had only been in out-of-home placement for approximately 13 months at that time, a referral to the State for termination proceedings was not yet applicable. See Neb. Rev. Stat. § 43-292.02 (Cum. Supp. 2018) (requiring filing of petition to terminate parental rights when juvenile has been in foster care under responsibility of the state for 15 or more months of most recent 22 months).

To the extent that Julianna is making a due process argument, it also fails. Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017). The possibility of termination of her parental rights as a consequence of the State's filing of the petition in Bently's case was explained to Julianna at the time of the adjudication hearing, at which she appeared with her attorney. Although Julianna did not appear at the permanency hearing, her attorney did, and she was represented by counsel throughout the

termination proceedings, during which she took advantage of the opportunity to confront and cross-examine adverse witnesses and present evidence on her own behalf. This assignment of error fails.

*Necessity of Prior Adjudication in Alianna's Case.*

Julianna asserts that the juvenile court erred in not specifically adjudicating Alianna's case separately from the termination matter, and she argues that she was not provided the appropriate notice or opportunity to rehabilitate herself.

In its November 2019 order, the juvenile court adjudicated Alianna as child within the meaning of § 43-247(3)(a) and also found grounds for termination of Julianna' parental rights under § 43-292(2), (4), and (6) and that termination of her parental rights was in Alianna's best interests. The court did not specify that its finding of grounds for termination under § 43-292(6) applied to Bently's case only, and any such finding in Alianna's case was erroneous as prior adjudication is required for termination of parental rights under that subsection. However, the court also found grounds for termination of Julianna's parental rights to Alianna under § 43-292 (2) and (4), and it did not err in doing so because termination of parental rights cases based on those grounds do not require a prior adjudication.

The Nebraska Supreme Court has stated:

> Unlike § 43-292(6) and (7), § 43-292(1) through (5) do not require, imply, or contemplate juvenile court involvement, including adjudication, prior to the filing of the petition for termination of parental rights. Instead, subsections (1) through (5) each concern historical actions or conditions of the parents such as abandonment, neglect, unfitnesses [sic], and mental deficiency. There is no requirement of longitudinal involvement of the juvenile court under § 43-292(1) through (5), much less a prior adjudication. Under [Neb. Rev. Stat.] § 43-291 [(Reissue 2016)], an original petition may be filed seeking termination of parental rights and the juvenile court acquires jurisdiction of the termination proceeding brought on by an original action under § 43-247(6) without prior juvenile court involvement, except where required by the Nebraska Juvenile Code.

*In re Interest of Joshua M. et al.*, 256 Neb. 596, 609-10, 591 N.W.2d 557, 566 (1999). See, also, *In re Interest of Keisha G.*, 21 Neb. App. 472, 840 N.W.2d 562 (2013) (defective adjudication does not preclude termination of parental rights under § 43-292(1) through (5), since no adjudication is required to terminate pursuant to those subsections, as long as due process safeguards are met).

Here, Julianna was advised in Alianna's case that termination of her parental rights was a possible consequence of the State's petition and she does not otherwise argue that her due process rights were violated. As discussed above, only one statutory ground is required for termination of parental rights, and we have already determined that termination of Julianna's parental rights to Alianna was proper under § 43-292(2) and that termination of her parental rights was in Alianna's best interests. This assignment of error fails.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Julianna's parental rights to Bently and Alianna.

AFFIRMED.