IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF BETTY Z.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BETTY Z., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

MARIA C., APPELLANT, AND CARLOS Z., APPELLEE
AND CROSS-APPELLANT.

Filed March 23, 2021.    No. A-20-509.

Appeal from the County Court for Cheyenne County: RANDIN R. ROLAND, Judge. Affirmed.

Robert S. Harvoy for appellant.

Jonathon T. Stellar, Special Acting Cheyenne County Attorney, for appellee State of Nebraska.

Katie Samples Dean, of Samples Dean Law, L.L.C., for appellee Carlos Z.

Audrey M. Elliott, guardian ad litem.

Moore, Riedmann, and Bishop, Judges.

Moore, Judge.

## I. INTRODUCTION

Maria C. appeals and Carlos Z. cross-appeals from the decision of the county court for Cheyenne County, sitting as a juvenile court, terminating their parental rights to Betty Z. For the following reasons, we affirm.

- 1 -

## II. BACKGROUND

Maria C. and Carlos Z. are the natural parents of Betty, born in May 2018. They were not married at the time of Betty's birth, but they married during the pendency of this case. Carlos is registered with the Fort Peck Assiniboine Sioux Tribe (the tribe) located in Poplar, Montana. Betty is eligible for enrollment as an associate member in that tribe. On June 1, 2018, the State of Nebraska filed a petition alleging that Betty Z. came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) for the reason that Maria tested positive and Betty tested "non-negative" for methamphetamine after being born. An ex parte order for temporary custody was granted the same day, placing Betty in the temporary custody of the Nebraska Department of Health and Human Services (DHHS). A hearing was held on June 4, 2018, and the court continued temporary custody in DHHS with placement in foster care. On July 6, the court ordered that Betty be returned to her parents' home, subject to 40 hours per week of family support with "drop ins"; and daily drug testing for Maria and a hair follicle test.

On July 13, 2018, the State filed a notice pursuant to the Nebraska Indian Child Welfare Act (NICWA), and the Bureau of Indian Affairs Guidelines for State Courts; Indian Child Custody Proceedings. The notice contained Betty's name, along with her tribal affiliation of "Sioux" and Carlos' tribal enrollment number. The notice advised the tribe of its right to intervene in the proceeding. The certificate of service shows that the notice was served by registered mail, return receipt requested, to the Office of Tribal Service, the Fort Peck Assiniboine & Sioux Tribes, and the parents.

On July 16, 2018, the State filed a first amended petition which alleged that Betty was a child within the meaning of § 43-247(3)(a) for the reason that Maria and Betty are in a situation dangerous to the life or limb of Betty in that Betty's hair tested positive for methamphetamine. On the same day, the court adjudicated Betty on the amended petition following Maria's no contest answer to the amended allegations. The court ordered that Betty would remain in the home, supervised by DHHS, and authorized drug patches for the parents in lieu of daily testing.

A disposition hearing was held on August 13, 2018, at which various exhibits were received, including emails regarding an Amber Alert for Betty dated July 18 and 19, information from the tribe concerning Betty's eligibility to be an associate member, and drug test lab results for Maria. In an order entered the same day, the court adopted DHHS' case plan, ordered that Betty be placed in foster care under the supervision of DHHS, ordered the parents to obtain substance abuse and parenting capacity evaluations (to be paid for by DHHS), and ordered an expedited "ICPC" to Arizona for the maternal grandmother's home be done by DHHS. The case plan required Maria and Carlos to address their substance abuse problems by agreeing to not use any illegal substances, follow the recommendations of a substance abuse evaluation, and comply with court-ordered drug testing. The permanency plan was reunification.

A review hearing was held on October 22, 2018, which continued Betty's out-of-home placement, required the parents to obtain hair follicle testing and drug patches, and provided for supervised visitation. The permanency goal was reunification with an alternative goal of adoption. In an order dated November 29, the court stated that it had inquired as to whether any party believes an Indian child is involved in the proceedings and directed the county attorney/DHHS to give notice pursuant to NICWA to the Fort Peck Assiniboine & Sioux tribe. At a review hearing held

on January 24, 2019, the court ordered the parents to sign releases for UA results to DHHS and ordered DHHS to continue the "sweat patches." On April 25, the court ordered an "Early Development Network" evaluation for Betty, required both parents to provide DHHS with a list of current prescribed medication and complete all previously ordered evaluations as soon as possible, and referred the case for a "Child Welfare Conference" at a mediation center. On July 25, the court appointed an educational surrogate for Betty upon the motion of Betty's guardian ad litem (GAL), which motion alleged that the parents had been uncooperative with setting up services for Betty. A review hearing was held on August 22, at which the court continued the case to September 26 for "First Appearance -- First Reading on TPR Petition."

Maria filed an application to terminate the court's jurisdiction on September 10, 2019, alleging that the Indian Child Welfare Act (ICWA) and NICWA had been violated, and Carlos joined in the motion. On September 17, the State and guardian ad litem (GAL) filed a complaint to terminate both parent's parental rights. The complaint alleged that Betty is not a child subject to ICWA. The complaint was nevertheless served on the tribe by registered mail, and served on both Maria and Carlos by personal service. On the same day, the State filed another NICWA notice, which indicated that it was sent by registered mail, return receipt requested, to the Office of Tribal Services, the tribe, and the parents. On September 19, the State and GAL filed an objection to the motion to terminate jurisdiction and a request to dismiss the motion.

The State and GAL filed an amended complaint to terminate parental rights on December 9, 2019. This complaint again alleged that Betty is not a child subject to ICWA. This complaint was served electronically to the parents through their attorneys and was sent to the tribe by regular first class mail.

Trial on the complaint to terminate and on the parents' motion to terminate jurisdiction began on December 20, 2019. Both Maria and Carlos moved for a continuance of the trial, which the court denied. The trial was held over several dates between December 2019 and June 2020.

On January 7, 2020, after the first day and before the second day of trial, the State and GAL filed a Second Amended Complaint to Terminate Parental Rights. The complaint alleged that termination was appropriate under Neb. Rev. Stat. § 43-292(2) (Reissue 2016) (parents substantially and continuously neglected Betty), § 43-292(3) (parents have neglected to provide Betty with necessary subsistence, education, or other necessary care), § 43-292(4) (parents are unfit by reason of habitual use of narcotic drugs), § 43-292(6) (reasonable efforts to preserve and reunify the family have failed to correct the conditions leading to adjudication), and § 43-292(7) (Betty has been in an out-of-home placement for 15 or more months of the most recent 22 months). The complaint also alleged that Betty is not a child subject to ICWA, but pled in the alternative, that if the court were to find Betty is a child under ICWA; then active efforts had been made to provide remedial services and rehabilitative programs, although unsuccessfully, to prevent the breakup of the Indian family, and that continued custody of the child by the parents or Indian custodian is likely to result in serious emotional and physical damage to the child pursuant to Neb. Rev. Stat. § 43-1504 (Reissue 2016). The complaint alleged that it is in Betty's best interests that her parents' parental rights be terminated. Finally, the complaint alleged that notice of the original termination motion and amended complaint to terminate parental rights was sent to the tribe without any court intervention or filing. The second amended complaint was sent to the parents' attorneys by email, fax, and first class mail and sent to the tribe by registered mail. A separate

Certificate of Service filed by the GAL indicates the complaint was sent to the tribe by regular mail. The following evidence was heard at trial.

On the first day of trial on December 20, 2019, Maria was allowed to call witnesses out of order for scheduling reasons. Maria called three tribal members to testify to matters relating to Indian tribes, culture, and children; John and James Schrimpscher, members of the Fort Peck Assiniboine Sioux Tribe; and Anthony Padilla, a member of the Apache tribe. After these witnesses were asked questions relating to Indian matters, the GAL objected on relevance, arguing that such testimony was not relevant because the operative complaint to terminate parental rights alleged that ICWA was not applicable to this case. The court sustained that objection. In an offer of proof, John testified that it is important for a Native American child to be raised in a Native American family because of the history and traditions. James, in an offer of proof, testified to the importance of a Native American child being with a Native American family to learn the spiritual customs, and that it was important for Betty to not break up the family. Padilla testified, prior to any objection, about the general importance of the ICWA legislation as it relates to Native American children and the importance of protecting them from losing their identity. He also testified to the importance of these children remaining with immediate family or at least with a Native American family. Padilla was also allowed to testify that he had reviewed documents in this case and was concerned that ICWA was not followed in that Betty was not treated as part of the tribe or of Native American descent and was not placed with family. Thereafter, through an offer of proof, Padilla testified that it was important to impart the Native American culture to a Native American child, and that it was in Betty's best interests to be placed with her mother. After Maria completed the examination of her witnesses, the GAL presented her evidence. Jennifer Burgess, a child and family service specialist with DHHS, was the worker who received the intake on the family following Betty's positive test for methamphetamines after birth. Burgess testified that Betty was initially removed from Maria and Carlos' care on May 31, 2018, pursuant to an emergency temporary order. Betty was placed back in Maria and Carlos' care on July 6, 2018, with the condition that the parents agreed to follow various provisions, including that the parents were to notify family support any time they left the state for medical appointments. Burgess testified that after 10 or 11 days, the parents became noncompliant with family support and they ultimately took Betty out of state without notifying DHHS. An Amber alert was issued, Betty was eventually located, and she was placed back in foster care. Betty has been in an out-of-home placement since that time.

During the 6 weeks that she was working on Betty's case, Burgess set up supervised visits with Betty and her parents, arranged transport for Betty to visit her parents in Colorado, provided gas vouchers to Betty's parents, established drug testing with Betty's parents, and provided in-home family services for the parents while Betty was in their care for up to 40 hours a week.

Burgess discussed with Maria and Carlos the availability of family members for Betty's placement and whether they were enrolled in any Native American tribe. Based on Carlos' indication that he was enrolled in the Fort Peck tribe, Burgess sent a notification letter to the tribe by certified mail in June 2018, and the "green card" showing receipt of the notification by the tribe was returned to DHHS and received in evidence. The notice was also sent to the Bureau of Indian Affairs as part of the Department's policy. In addition, Burgess identified the ICWA notice sent by the State as well as the return receipt showing that the tribe received the notice. On

cross-examination, Burgess agreed that Carlos's tribal identification number was listed incorrectly on the ICWA notices sent by the State and she provided the correct identification number.

At the continued trial on February 18, 2019, Sarah Robinson, a child and family services specialist with DHHS, testified that she was assigned to Betty's case between July 2018 and July 2019, and then again in October 2019 until the time of trial. Robinson confirmed that after Betty's initial removal following her birth, she was returned to Maria from the end of June until July 18, 2018. On that date, she was unable to get ahold of the parents or locate Betty, and an Amber alert was issued. Betty was eventually found a few days later in Colorado and Robinson picked her up from Colorado authorities and returned her to her foster home in Nebraska. Robinson testified that since Betty was removed from Maria and Carlos's care again in July 2018, Betty has not been returned to their care and that Betty's out-of-home placement has lasted more than 15 of the most recent 22 months.

Robinson testified that DHHS sent out notice to the tribe and received information back from the tribe. Specifically, on July 30, 2018, she received a letter of notification indicating that Betty was eligible as an associate member of the tribe, and attached to the letter was registration requirement information and an enrollment form. In May 2019, Robinson contacted the tribe and spoke with the ICWA program manager from the tribe. The program manager verified that she had received the DHHS notifications and case plans and court reports. Robinson was advised that Betty was an associate member of the tribe but not eligible for enrollment as a full member, that the tribe would look for family if asked to do so, and that the tribe would not intervene on Betty's behalf. In January 2020, Robinson again contacted the tribe and spoke with another individual who advised that Betty was considered an Indian child under the tribe's guidelines, but that Betty was not considered an Indian child under ICWA.

Robinson provided the court with a document outlining all her contacts or attempted contacts with the tribe, as well as when she sent the tribe case plans and court reports. She also provided the court with a document outlining her efforts in this case as set forth in the list of "active efforts" provided by the Bureau of Indian Affairs. Robinson testified that based upon the information she received in the case, she did not feel that ICWA applied, however, she provided active efforts as if it was applicable. Robinson confirmed that a cultural plan was not developed in this case, and that a cultural plan was not requested by the parents or the tribe. Robinson also provided the parents with enrollment paperwork from the tribe, but Carlos never completed and signed it. According to Robinson, at the time of Betty's removal, there were no licensed Native American foster homes in the area and the tribe that was eventually identified is in Montana, which was not near the parents. Robinson indicated that an "ICPC" has been ordered, but not yet completed, regarding Carlos' sister in Arizona for possible placement of Betty.

Robinson testified that during her time on the case, Maria initially completed a substance use evaluation, but Carlos did not. Neither parent attended the requested follow-up substance use or parenting evaluations, and Maria did not attend a mental health evaluation. According to Robinson, Maria and Carlos continued to test positive for methamphetamine use throughout the case or declined testing. Robinson indicated that Maria stopped cooperating with drug patches in August 2019 and Carlos in October 2019. Robinson offered referrals and services for both parents, which they always declined or denied they had a problem. Robinson has never received a negative drug test for methamphetamine from either parent. Robinson testified that the parents regularly

failed to utilize family support, did not consistently attend visits with Betty, and did not attend all of the scheduled team meetings. Robinson acknowledged that Carlos has a seizure disorder which prevented him from attending some of the visits and family support. Robinson testified that during the visits that were not canceled, Maria's older daughter would do some of the parenting for Maria.

Throughout Robinson's supervision of the case the parents maintained a residence until December of 2019 when they were evicted. Neither parent maintained employment during the case and during visits with Betty they sometimes did not provide supplies when they were required to by DHHS. At various times throughout the case, Maria and Carlos were incarcerated either in Colorado or Nebraska. Robinson testified that she believes that the parents have not made enough progress in their case plans for Betty to be returned to their care. Robinson believed that it would be unsafe for Betty to return to her parents' care due to their continued drug use, lack of participation in their case plans, as well as Betty's young age. Robinson testified that she believes it is in Betty's best interest that her parents' parental rights be terminated because of their methamphetamine use and failure to provide for Betty.

Stephanie Blessin, a child and family services specialist with DHHS, worked on Betty's case from July 2019 to October 2019, while Robinson was on maternity leave. During those 3 months, Blessin testified that Maria and Carlos missed some of the team meetings, declined to participate in family support, did not attend all of the allowed visitation time, and failed to complete a parenting evaluation. In addition, Carlos had several positive drug tests while Maria began refusing drug testing through use of the patch, and she failed to attend a mental health evaluation.

Alyssa Mitzelfelt, a family support worker with Family 4Ward, provided support for Betty's case from May 2019 to the time of trial. Family 4Ward provides visitation and family support for state wards. Mitzelfelt testified that the parents missed quite a few scheduled visits with Betty during October, November, and December. Mitzelfelt testified that during visits the parents would take care of Betty's needs and interact with her by reading a book or watching a movie. Mitzelfelt indicated that Maria stopped wearing the drug patch in October or November 2019, and Mitzenfelt observed the redness on Maria's skin from the patch.

Janet Vath with Family 4Ward, worked on Betty's case for 8 months. Vath testified that during the time she worked on the case the parents were reluctant to work with family support and that they missed a lot of visits. In late September of 2019, Vath and the DHHS eliminated the in-home visits after Maria refused to allow the GAL to enter the parents' home. Vath also testified that Maria and Carlos both tested positive for methamphetamines and amphetamines during her time working on the case, and that she was not aware of a single negative drug test for either parent.

Steve Elmshaeuser, was appointed the educational surrogate for Betty. He testified that Betty is developmentally delayed. Although Betty qualified for early development educational services, Maria and Carlos refused to allow Betty to receive services.

Edison Red Nest, a member of the Oglala Sioux Tribe and a social worker for Native Futures, testified regarding his familiarity with ICWA and this case. Native Futures contracts with the Nebraska Office of Juvenile Services, South District 12 Probation, and DHHS for various family support services, including Native American cultural services. Red Nest has testified previously as an expert with respect to Native American Culture and he was recognized by the court as an expert in this case.

Red Nest was asked to review this case to give an opinion as to whether termination of parental rights would be appropriate. He reviewed the case file, including the GAL reports, DHHS reports and court reports. He testified that exposing children to drugs is not culturally appropriate. Red Nest testified that he is involved with educating Indian families about methamphetamine and alcohol use. He discussed the importance of the Indian parents being the protector of the Indian child and that includes abstaining from the use of illegal substances.

Red Nest testified that he believed active efforts were provided to Maria and Carlos in an effort to reunify them with Betty and that the services applied to this family have been unsuccessful to reunify or to prevent the breakup of the family. He testified that for Betty to remain in Maria and Carlos' care would likely result in serious emotional and physical harm, especially considering the parents are still using methamphetamine and Betty is only 18 months old and can't speak for herself.

Red Nest further testified that placement of an Indian child into an Indian home is "the law," however, such placement is subject to there actually being such a home available. He indicated that placing Betty close to her parents in a home that was not ICWA-compliant was an acceptable alternative in this case given the unavailability of an Indian foster home and because the parents did not object to that placement.

Following the State and GAL's presentation of evidence, Maria testified on her own behalf. At the time of the April 22, 2020 hearing, Maria's three older children were residing in Arizona. Maria testified that she had a difficult pregnancy with Betty and was taking the medication Lebetalol for high blood pressure. Betty indicated that her OB/GYN doctor advised her that this medication could result in having a false positive drug test. Maria also offered into evidence various exhibits including, among other things, a certificate showing her participation in a drug and alcohol awareness class, the drug evaluation completed in June 2018, and a July 2019 evaluation report on Betty showing no verified disability.

At the end of the trial, the court found by clear and convincing evidence that Maria and Carlos' have substantially and continuously or repeatedly neglected and refused to give Betty necessary parental care and protection. The court further found by clear and convincing evidence that the parents, being financially able, have willfully neglected to provide Betty with the necessary education or other necessary care. The court further found that the parents are unfit by reason of habitual use of narcotic drugs, which the court found to be seriously detrimental to the health, morals, or well-being of Betty. The court also found by clear and convincing evidence that Betty has been in an out-of-home placement for 15 or more months of the most recent 22 months. The court determined that ICWA applies to this case beyond a reasonable doubt, but that it is not in Betty's best interest to remove her from her current placement and that active efforts were made under ICWA. The court concluded that it was "most definitely" in Betty's best interest to terminate the parental rights of Maria and Carlos. Finally, the court denied the parents' application to terminate jurisdiction.

Maria now appeals, and Carlos cross appeals.

### III. ASSIGNMENTS OF ERROR

Maria assigns that (1) the State and GAL failed to notify essential parties to the proceedings as required by the ICWA and NICWA, (2) the State and GAL failed to provide the mother with

proper notice under the ICWA and the NICWA, (3) the trial court erred in excluding the testimony of the mother's three witnesses concerning whether the parents continued custody would result in serious emotional or physical harm under ICWA and NICWA, (4) the trial court erred in allowing the State and GAL to amend the complaint for termination of parental rights by adding necessary ICWA and NICWA language after the start of trial, (5) the trial court erred in finding that active efforts were used to prevent the breakup of the Indian family, and (6) the trial court erred in overruling Maria's application to terminate jurisdiction for failing to comply with ICWA and NICWA.

In his cross-appeal, Carlos assigns that (1) the State and GAL failed to properly plead and notify essential parties to the proceedings as required under ICWA and NICWA, (2) the trial court erred in ruling that the State had complied with ICWA and NICWA in the placement of the child, (3) the trial court erred in finding that there were active efforts used to prevent the breakup of the Indian family, (4) the trial court erred by not specifically finding that there was evidence beyond a reasonable doubt that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child.

## IV. STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Taeson D.*, 305 Neb. 279, 939 N.W.2d 832 (2020).

## V. ANALYSIS

### 1. ICWA ISSUES

Because both Maria and Carlos assign several of the same or similar errors regarding the application of ICWA and NICWA in this appeal, we have consolidated and reordered our analysis to address these issues collectively. For ease of reading, we refer to both the ICWA and NICWA as "ICWA" in our analysis.

#### (a) ICWA Pleadings and Notice

Maria and Carlos both argue that the State and GAL failed to notify essential parties to the proceedings as required by the ICWA. They assert that the proceedings were defective in that the initial petitions did not make reference to ICWA. They further argue that the tribe was not properly notified as required by ICWA.

Neb. Rev. Stat. § 43-1505(1) (Reissue 2016) states:

In any involuntary proceeding in a state court, when the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall send a notice conforming to the requirements of 25 C.F.R. 23.11 to the parents, the Indian custodian, and the Indian child's tribe or tribes, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.

Further, no foster care placement or termination of parental rights proceedings shall be held until at least 10 days after receipt of notice by the parent or Indian custodian and the tribe or tribes or the secretary. *Id*. Accordingly, 25 C.F.R. § 23.111(d) requires:

Notice must be in clear and understandable language and include the following:

(1) The child's name, birthdate, and birthplace;

(2) All names known (including maiden, married, and former names or aliases) of the parents, the parents' birthdates and birthplaces, and Tribal enrollment numbers if known;

(3) If known, the names, birthdates, birthplaces, and Tribal enrollment information of other direct lineal ancestors of the child, such as grandparents;

(4) The name of each Indian Tribe in which the child is a member (or may be eligible for membership if a biological parent is a member);

(5) A copy of the petition, complaint, or other document by which the child-custody proceeding was initiated and, if a hearing has been scheduled, information on the date, time, and location of the hearing . . . .

We agree that the initial petition filed on June 1, 2018, and the amended petition filed on July 16 did not contain any reference to ICWA. However, on July 13, 2018, the State filed a notice pursuant to NICWA, and the Bureau of Indian Affairs Guidelines for State Courts; Indian Child Custody Proceedings. The notice contained Betty's name, her year of birth, her address, her tribal affiliation, her mother and father's name, and her father's tribal enrollment number. The notice advised the tribe of its right to intervene in the proceeding, among other things. A copy of the juvenile petition was attached. The certificate of service shows that the notice was served by registered mail, return receipt requested, to the Office of Tribal Service, the Fort Peck Assiniboine & Sioux Tribes, and the parents. Additional evidence shows that the State received the return receipt acknowledging the tribe's receipt of the notice. Further evidence shows that the tribe was provided with additional notices, copies of pleadings, case plans, and other materials during the pendency of the case. According to Robinson, she spoke with tribe representatives on two occasions and was advised that the tribe did not plan to intervene in the case. Thus, the record supports a finding that the State complied with the ICWA notice provisions and the tribe was properly notified of the proceedings.

(b) Complaints to Terminate Parental Rights

The original and first amended complaints to terminate parental rights alleged that Betty was not a child subject to ICWA. The record shows that the parents were personally served with the original complaint for the termination of parental rights. The complaints were served upon the tribe by mail. Another ICWA notice was sent to the tribe and the parents on the same day as the initial complaint. The trial on the amended complaint began on December 20, 2019, but was not completed that day. On January 7, 2020, the State and GAL filed a second amended complaint to terminate parental rights which again alleged that Betty was not a child subject to ICWA, but alleged alternatively that if she was such a child, that active efforts had been made to prevent the breakup of the family and that serious physical or emotional harm would occur if Betty was placed in the custody of her parents. This second amended complaint was served upon the tribe by

registered mail and the parents electronically via their attorneys. Subsequent hearings on this second amended complaint occurred in February, April, and June, 2020.

Maria argues that the parents and the tribe did not receive notice of the second amended complaint, containing the allegations that ICWA might apply, within 10 days of the beginning of trial, as required by statute. While the second amended complaint was filed after the first day of the termination trial, it was filed well in advance of the remaining trial dates and was properly served upon the parents and the tribe. Further, both parents appeared at the termination proceedings in this case. A general appearance waives any defects in the process or notice, the steps preliminary to its issuance, or in the service or return thereof. *In re Interest of Michael N.*, 302 Neb. 652, 925 N.W.2d 51 (2019).

Thus, the parents and tribe received timely notice of the filing of the second amended complaint to terminate parental rights and this argument fails.

Maria also assigns that the trial court erred in allowing the State and GAL to amend the termination complaint by adding ICWA language after the start of trial. As noted above, Maria attempted to introduce ICWA-related testimony on the first day of the termination trial, but the State's relevance objection was sustained since the operative complaint at the time did not allege the application of ICWA. The State and GAL thereafter filed the second amended complaint with the alternative ICWA allegations. The record does not show any objection to the amendment by the parents and they participated in the trial going forward. The trial continued on three dates following the amendment of the complaint and the parents were able to cross-examine witnesses regarding the State's compliance with ICWA requirements and were not precluded from introducing evidence of their own regarding ICWA.

Clearly, the parents believed that ICWA applied in this case and the amendment to the complaint to include these allegations was to their benefit to ensure compliance with the stricter standards contained in ICWA. See, also, *Blinn v. Beatrice Community Hosp. & Health Ctr.*, 270 Neb. 809, 708 N.W.2d 235 (2006) (parties recognized issue not presented by pleadings); Neb. Ct. R. Pldg. § 6-1115(b) (amendment to pleadings allowed when presented by evidence). We find no error in the court's proceeding on the second amended complaint to terminate parental rights.

(c) ICWA Witnesses

Maria assigns that the trial court erred in excluding testimony from her three witnesses concerning ICWA issues. The testimony was excluded as irrelevant prior to the amendment of the complaint to include ICWA allegations. We note that while the Nebraska Evidence Rules do not apply in cases involving the termination of parental rights, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights. *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007).

While Maria's witnesses were precluded from testifying about certain matters related to ICWA, each witness provided an offer of proof concerning what their testimony would include if they were allowed to testify about ICWA matters. The offers of proof provided for each witness indicated that they would testify about the importance of an Indian child remaining with his or her parents or an Indian family, and the importance of imparting the Indian history and traditions to an Indian child. Padilla was allowed to testify without objection to the importance of placing an Indian child with an Indian family and that such was not done in this case.

We agree with Maria that the procedure in this case was somewhat questionable in that she was precluded from offering evidence for the reason that ICWA had not yet been plead, but then the State amended the complaint thereafter to plead the possible application of ICWA and proceeded to offer evidence relating to it. However, we conclude that Maria was not prejudiced as a result of the trial court's exclusion of her witnesses' ICWA testimony. In our de novo review of the record, we are able to consider the opinion of these witnesses from their offers of proof. See *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993) (although trial court erred in failing to permit evidence tendered by mother regarding psychological evaluation, mother suffered no prejudice because appellate court considered evaluation from offer of proof in de novo review of record). Because we are able to consider the opinion of theses witnesses from the offers of proof, we find that the trial court's exclusion of Maria's witnesses' ICWA testimony did not violate fundamental due process. We also note that the trial continued on three separate dates after the amendment of the complaint to include alternative ICWA allegations and Maria could have adduced additional evidence in support of her position.

(d) Active Efforts

Pursuant to Neb. Rev. Stat. § 43-1505(4) (Reissue 2016):
Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family or unite the parent or Indian custodian with the Indian child and that these efforts have proved unsuccessful.

There is no precise formula for active efforts; the active efforts standard requires a case-by-case analysis and should be judged by the individual circumstances. *In re Adoption of Micah H.*, 301 Neb. 437, 918 N.W.2d 834 (2018).

In this case, several witnesses testified to the active efforts made by the State to provide remedial and rehabilitative services to prevent the breakup of the family. After initial removal, the State placed Betty back in her parents care for a short period of time until they violated the agreement to notify DHHS when they took Betty out of the state. Throughout the case, numerous services were offered to the parents, including supervised visitation; transportation assistance for visitations; gas vouchers; family support and in-home services; team meetings; substance use, mental health, and parenting evaluations; and drug testing. Robinson and Red Nest testified that the efforts made by DHHS in this case amounted to active efforts as required by ICWA.

The record also shows that the active efforts provided by DHHS were unsuccessful in reunifying Betty with her parents. Maria and Carlos failed to meet the goals of the case plans; they did not regularly attend team meetings regarding Betty's care and case plan, they missed scheduled visits with Betty, they did not obtain all of the recommended evaluations, and most importantly, they were noncompliant with drug testing. When the parents did comply with drug testing, they tested positive for methamphetamine or amphetamine every time.

A parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts. See *In re Adoption of Micah H., supra*. It is clear in this case that numerous services were offered to the parents, and they responded with

- 11 -

an unwillingness to participate. Therefore, we conclude that the trial court did not err in finding that the State has taken active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family or unite the parent or Indian custodian with the Indian child and that these efforts have proved unsuccessful, due to the parents' unwillingness to participate.

(e) ICWA Compliant Placement

Maria's final assignment of error is that the trial court erred in overruling her motion to terminate jurisdiction for the reason that the State has failed to comply with ICWA by not placing Betty in an ICWA compliant home. Neb. Rev. Stat. § 43-1508(2) (Reissue 2016) provides:

> Any child accepted for foster care or pre-adoptive placement or a voluntary foster care placement shall be placed in the least restrictive setting which most approximates a family and in which his or her special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or pre-adoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with one of the following in descending priority order:
>
> (a) A member of the Indian child's extended family;
>
> (b) Other members of the Indian child's tribe or tribes;
>
> (c) A foster home licensed, approved, or specified by the Indian child's tribe or tribes;
>
> (d) An Indian foster home licensed or approved by an authorized non-Indian licensing authority;
>
> (e) A non-Indian family committed to enabling the child to have extended family time and participation in the cultural and ceremonial events of the Indian child's tribe or tribes;
>
> (f) An Indian facility or program for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs; or
>
> (g) A non-Indian facility or program for children approved by an Indian tribe.

Under ICWA, factual support must exist in the trial record for the purpose of appropriate appellate review as to good cause for failure to comply with statutory child placement preference directives. *In re Interest of Enrique P. et al.*, 19 Neb. App. 778, 813 N.W.2d 513 (2012). In this case, there was testimony that there was not an ICWA-compliant home for Betty in the area where the parents were located, and Red Nest testified that placing Betty in a foster home in close proximity to the parents was a reasonable alternative. In addition, there is evidence in the record that efforts were being made to consider possible placement of Betty with Carlos' sister in Arizona. Based on the record presented at trial, we find that there was good cause for failure to comply with the placement directives. The trial court did not err in overruling the motion to terminate jurisdiction based on the State's failure to comply with ICWA.

(f) Serious Emotional or Physical Harm

Carlos assigns that the trial court erred by not specifically finding that there was evidence beyond a reasonable doubt that continued custody of the child by the parents is likely to result in serious emotional or physical damage to the child. Section 43-1505(6) states:

> The court shall not order termination of parental rights under this section in the absence of a determination by the court, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

While the trial court did not make this specific finding, such is implied in its order when it concluded that that ICWA applied to this case "beyond a reasonable doubt, but that it is not in Betty's best interest to remove her from her current placement." Even without a specific finding by the trial court articulated in the language of the statute, we are able to make this determination in our de novo review.

In this case, the State presented ample evidence that continued custody by the parents would result in serious emotional or physical harm. Red Nest testified that although maintaining Indian culture is important, continued drug use would undoubtedly cause serious emotional or physical harm to Betty. Here, the parents failed to obtain the requested evaluations, and they either failed to comply with drug testing or tested positive for drug use throughout the case. They have been incarcerated at times throughout the case, and had been evicted from their home at one point. The record clearly shows that Betty's welfare would be in danger should Maria and Carlos have custody. This court has previously held that when a parent's addiction makes it impossible for a parent to choose his or her children rather than drugs, it is improper to suspend the children in foster care while awaiting uncertain parental maturity, and any such suspension would undoubtedly cause serious physical or emotional damage. *In re Interest of Louis S. et al.*, 17 Neb. App. 867, 774 N.W.2d 416 (2009). For these reasons, we find that the record contains evidence beyond a reasonable doubt that continued custody of Betty by Maria and Carlos is likely to result in serious emotional or physical damage to Betty.

2. STATUTORY BASIS FOR TERMINATION AND BEST INTERESTS

Although neither Maria nor Carlos assign error to the trial court's finding of statutory bases for termination of their parental rights under § 43-292 and its finding that termination of their parental rights was in Betty's best interests, we address these findings for the sake of completeness.

Our review of the record clearly and convincingly shows that grounds for termination of Maria and Carlos' parental rights under § 43-292(7) existed because Betty has been in an out-of-home placement for 15 months of the most recent 22 months. Betty has remained in an out-of-home placement since July 2018. At the time the initial complaint to terminate parental rights was filed in September 2019, she had been out of the parents' home for 16 months. Moreover, by the time of the final termination hearing in June 2020, Betty had been out of the home for 25 months.

Once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*,

283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). This presumption is overcome only when the State has proved that the parent is unfit. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

In this case, the trial court found that it was "most definitely" in Betty's best interests to terminate the parental rights of Maria and Carlos. We agree. The record reveals clear and convincing evidence that Maria and Carlos are unable to put Betty's needs above their own as evidenced by their continued methamphetamine use and refusal to undergo further drug evaluations and testing. As discussed above in connection with the finding of serious harm to Betty, it would certainly be a detriment to Betty to be placed in the custody of her parents. The record shows that Betty needs and deserves permanence in her life. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). Here, Maria and Carlos have not shown that they are able to provide appropriate care to Betty. Thus, the trial court did not err in finding that it was in Betty's best interests to terminate Maria and Carlos' parental rights.

## VI. CONCLUSION

For the reasons stated above, we affirm the decision of the county court, acting as juvenile court, to terminate Maria and Carlos' parental rights.

AFFIRMED.